Present: Chief Judge Decker, Judges Humphreys, Beales, Huff, O'Brien, AtLee, Malveaux,
       Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins and White
Argued at Richmond, Virginia

**PUBLISHED**

TERESA MARY MAUST

v.      Record No. 0505-21-4

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE MARY BENNETT MALVEAUX
MAY 30, 2023

UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Bruce Strickland, Judge[1]

Andrew J. Cornick (Andrew J. Cornick, LLC, on brief), for
appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Teresa Mary Maust ("appellant") appeals her conviction for distribution of a Schedule I or II

controlled substance, in violation of Code § 18.2-248. Before a panel of this Court, appellant

argued that the trial court erred in finding that the evidence was sufficient to prove that she

distributed oxymorphone because no rational trier of fact could have concluded that the evidence

reasonably excluded her theory of innocence. A panel majority of this Court reversed appellant's

conviction. *Maust v. Commonwealth*, No. 0505-21-4 (Va. Ct. App. Aug. 9, 2022). We granted the

Commonwealth's petition for rehearing en banc and stayed the mandate of the panel's decision.

Upon rehearing en banc, we affirm the trial court.

---

[1] Judge J. Bruce Strickland entered the final sentencing order in this case. Judge Charles
S. Sharp presided over appellant's trial and entered the conviction order.

## I. BACKGROUND

"[W]e review factfinding with the highest degree of appellate deference." *Commonwealth v. Barney*, ___ Va. ___, ___ (Mar. 16, 2023) (quoting *Bowman v. Commonwealth*, 290 Va. 492, 496 (2015)). "In accordance with established principles of appellate review for a sufficiency of the evidence case, we view the 'evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court.'" *Peters v. Commonwealth*, 72 Va. App. 378, 383 (2020) (quoting *Riner v. Commonwealth*, 268 Va. 296, 330 (2004)). Therefore, we will "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

On October 1, 2018, Stafford County Detective Shawn Monaghan used a confidential informant, Robert Gale, to conduct a controlled buy of three oxymorphone pills from appellant. Monaghan searched Gale and his car at a staging area before the controlled buy, finding neither drugs nor money. Monaghan "directed" Gale to go to appellant's residence to buy the pills. Monaghan expected each pill to cost about $100 and understood that Gale owed appellant some money, so he provided Gale with $320 in cash. Monaghan photographed the cash to record the serial numbers and denominations. He also equipped Gale with an audio-only recording device, which did not permit Monaghan to listen in real time.

At trial, Monaghan testified that he did not recall Gale's girlfriend, Tiffany Love, accompanying Gale on October 1, 2018, but an unidentified woman can be heard on the audio recording speaking with Gale during the drive to and from appellant's house. A few minutes before Gale arrived at the house, Gale told his companion, "Text her and say here." While the entire conversation between Gale and the woman cannot be heard clearly on the audio recording,

no audible conversation indicates that Gale gave money to his companion or received pills from her.

Monaghan followed Gale's car to appellant's street but lost sight of it after Gale entered appellant's driveway. Other cars were in the driveway, but Monaghan did not recall whether there were other vehicles in the home's garage.

The audio device recorded Gale entering appellant's house and exchanging greetings with appellant.[2] They then discussed some "new" kitchen appliances that appellant claimed were worth over $3,000 and wanted to sell for $1,000. Gale gave appellant $270, which she verbally acknowledged receiving. After discussing the kitchen appliances again, appellant said, "Give me a second," and Gale responded, "Okay. Alright. I'll be outside." Gale left the house to wait; appellant followed two minutes later, and they again spoke about the appliances before Gale left. Gale was in appellant's home for about ten minutes.

The audio recording from inside appellant's home is inaudible at certain points. The only audible conversation was between Gale and appellant, although Monaghan acknowledged at trial that an unidentified woman's voice could also be heard on the portion of the audio recording from inside the house. At one point during this portion of the audio recording, Gale and the unidentified woman seem to exchange greetings, but he did not have any additional conversation with her. Appellant testified at trial that she could hear the voice of Sue Stone, a woman who lived with her, on the audio recording.

Gale drove back to the staging area with Monaghan following him. Gale's companion was recorded speaking with him during this drive, and the recording includes no audible conversation about exchanging money or pills. Monaghan retrieved the recording device,

---

[2] At trial, Monaghan identified appellant's voice on the recording based on his face-to-face interview with appellant.

searched Gale and his vehicle, and confirmed that Gale no longer had the buy money, although he did have $16 in cash. Monaghan also found three pills on Gale's person that subsequent lab analysis determined were oxymorphone, a Schedule II controlled drug.

Gale died before trial. Monaghan testified at trial that Gale had been an opioid addict and that he had been convicted of multiple felonies.

Monaghan searched appellant's house the day after the controlled buy, finding "numerous pills," "pill crushers," a "pill press," "numerous prescription bottles for different narcotics, the majority of which were empty," and a "large amount" of currency. In appellant's bedroom, police found $138 and an additional $4,351 in a safe.[3] Among the contents of the safe, Monaghan identified $270 of the $320 he had provided Gale to make the controlled buy.

The cash in the safe was in an envelope that had handwritten notations which Monaghan described as indicating "pills or . . . money," and columns of numbers he described as "totals."[4] Monaghan characterized this envelope as an "owe sheet[]," which he explained was used by drug dealers "to keep track of drugs that they front or give to people on credit."

While the search was underway, appellant arrived and was interviewed by Monaghan. When confronted by Monaghan about pill sales at her home, she first told Monaghan that her ex-husband stole her prescription pills, which she had for a "legitimate prescription," and any drug sales conducted at the house should be attributed to him. Appellant said that she purchased the safe to keep her pills away from her ex-husband and that she only began using the safe to

---

[3] Appellant provided Monaghan the combination to the safe.

[4] The first set of notations, a column, are as follows: "B = 11[,] G = 17[,] J = 121[,] H = 25[,] L = 19." The second set of notations, also a column, is partially concealed on the Commonwealth's exhibit, but the notations that can be read are "850 2450 250 95," all above a line, and then the number "4710" below the line. A third set, another column, have the numbers "1210 1210" above a line, with "2420" below the line, and then "419" and "5" above another line with "95" below that line.

- 4 -

store money once her ex-husband moved out of the house. In addition to her ex-husband, appellant also stated that a woman named Briana Perry was responsible for any pill sales at her house.

When Monaghan told appellant that two of her pills were found on Sue, she claimed that she gave them to Sue to "hold on to for [appellant]," although she later admitted that she gave the pills to Sue to use, but only because Sue had the same prescription as appellant. She also said that she sometimes lent pills to other people but again denied selling them. While looking at appellant's phone, Monaghan told appellant that "Greg Murphy is talking to you about getting pills," which appellant denied. She then admitted that she sometimes allowed Murphy to borrow pills.

According to Monaghan, during the interview appellant "surmised" that Gale was the confidential informant and then told him that any money she took from Gale was for a debt Gale owed to her. Regarding Gale, appellant told Monaghan that he "comes to me when he runs out," and "sells more than I do."

Appellant also told Monaghan that her safe contained around $4,500 and that she had withdrawn the money from her bank so she could find a new place to live because her house was in foreclosure. She said she had withdrawn the money in stages—writing "a $2,000 check not too long ago," "tak[ing] out $600 in cash, $300 in cash" at a time, and "socking it to the side." Appellant stated that the buy money found in her safe was payment of Gale's debt to her, which she said was "a $100 and something dollars."

Appellant told Monaghan that her two sons and Sue were the only other persons living in the house at the time of the search.

At the close of the Commonwealth's case-in-chief, appellant moved to strike the evidence, which the court denied. Thomas Hogan then testified in appellant's defense, stating

that he had been one of nine or ten tenants staying at appellant's house in October 2018. Hogan stated that he had collected the rent from the other tenants on the first of each month and then gave it to appellant. Hogan said he paid $600 in rent, but others "sometimes" paid less. He claimed that Gale came to appellant's house to look at appliances, although Hogan acknowledged that he was not present when Gale was at the house on October 1, 2018. Hogan did not know the combination to appellant's safe.

Appellant testified that Gale came to her house to look at appliances and to make a down payment on a compressor and nail gun. She stated that Gale owed her $100 or $150 and that on the day of the controlled buy, Gale paid her what he owed plus another $100 or $150 for the down payment. As for the owe sheet, appellant claimed that she used a system to track her money in which she "put down eleven for Benjamin," "G, a George Washington, J, Jefferson, Hamilton"; she could not remember what the "L" stood for, although with prompting from her counsel said that it probably stood for "Lincoln," a "five dollar bill." She testified that she had rented rooms in her home, charging between $300 and $600 per month.

After argument by counsel, the trial court convicted appellant of distribution of a Schedule I or II controlled substance. In its ruling, the trial court found that: (1) Gale was given buy money and was searched before making the controlled buy, and no contraband was found on him; (2) Gale was in appellant's home for approximately ten minutes, and the only substantive conversation that could be clearly heard on the audio recording during that time was between Gale and appellant, and that "[i]n the course of that relatively garbled transmission, one thing is clear, that at some point there was an exchange of cash money"; (3) Gale then left appellant's house, and Monaghan again searched him and found three oxymorphone pills and no buy money; and (4) the buy money was found in appellant's safe during a search and that any person other than appellant had "limited access" to the safe. The court found that the "only reasonable

- 6 -

inference to be drawn from that set of circumstances is that the transaction went down exactly as has been argued by the Commonwealth."

## II. ANALYSIS

Appellant argues that the trial court erred in finding the evidence sufficient to support her conviction for distributing a Schedule I or II controlled substance because the evidence was circumstantial and failed to exclude all reasonable hypotheses of innocence.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)). In addition, "[t]he judgment of the trial court, sitting without a jury, is 'entitled to the same weight as a jury verdict.'" *Perkins*, 295 Va. at 327 (quoting *Cole v. Commonwealth*, 294 Va. 342, 361 (2017)).

Appellant argues that a reasonable hypothesis of innocence exists—that Gale used the buy money to repay a debt to her and that he obtained the three pills from someone other than

her.  Appellant points to the presence of a woman in the car with Gale on the drive to and from

her house[5] and to the voice of a woman other than her in the house with Gale.

"Where a controlled purchase of drugs is concerned, 'without [the informant's]

testimony, the evidence proving that the [drugs] came from the defendant' may be 'purely

circumstantial.'"  *Bennett v. Commonwealth*, 69 Va. App. 475, 492 (2018) (alterations in

original) (quoting *Jones v. Commonwealth*, 21 Va. App. 435, 441-42 (1995) (en banc)).

"Circumstantial evidence, if sufficiently convincing, is as competent and entitled to the same

weight as direct testimony."  *McCain v. Commonwealth*, 261 Va. 483, 493 (2001).  But "when

the evidence is wholly circumstantial . . . all necessary circumstances proved must be consistent

with guilt and inconsistent with innocence and exclude every reasonable hypothesis of

innocence."  *Haas v. Commonwealth*, 299 Va. 465, 468 (2021) (quoting *Rogers v.

Commonwealth*, 242 Va. 307, 317 (1991)).  "This requires an unbroken evidentiary chain of

necessary circumstances, which satisfies 'the guarded judgment that both the corpus delicti and

the criminal agency of the accused have been proved to the exclusion of any other rational

hypothesis and to a moral certainty.'"  *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)

(quoting *Wright v. Commonwealth*, 292 Va. 386, 397 (2016)).  The "reasonable-hypothesis

principle," however, "is not a discrete rule unto itself" and "does not add to the burden of proof

placed upon the Commonwealth in a criminal case."  *Vasquez*, 291 Va. at 249-50 (quoting

*Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).  "The Commonwealth . . . is not required

to exclude every possibility that others may have committed the crime for which a defendant is

---

[5] In appellant's motion to strike and closing arguments, she contended only that the evidence was insufficient due to the presence of other voices in the house and did not mention the presence of the woman in the car with Gale.  "[U]pon appellate review, the issue of exclusion of reasonable theories of innocence is limited to those theories advanced by the accused at trial."  *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003).  However, on appeal in this case, the Commonwealth has not argued before the panel of this Court or en banc that appellant's contention regarding the woman in the car is waived under Rule 5A:18.

charged, but is only required to exclude hypotheses of innocence that flow from the evidence." *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000). Thus, the reasonable-hypothesis principle "is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" *Moseley*, 293 Va. at 464 (quoting *Hudson*, 265 Va. at 513). "It is true that a factfinder cannot 'arbitrarily' choose, as between two equally plausible interpretations of a fact, one that incriminates the defendant." *Vasquez*, 291 Va. at 250 (quoting *Dixon v. Commonwealth*, 162 Va. 798, 803 (1934)). An arbitrary choice occurs "only when no rational factfinder could believe the incriminating interpretation of the evidence and disbelieve the exculpatory one." *Id.*

On appeal, in reviewing a defendant's claim that a trial court unreasonably rejected her hypothesis of innocence, we are mindful that "[w]hether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on [this Court] unless plainly wrong." *Wood v. Commonwealth*, 57 Va. App. 286, 306 (2010) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "As long as 'a rational factfinder could reasonably reject [the appellant's] theories in his defense and find that the totality of the suspicious circumstances proved [his guilt] beyond a reasonable doubt,' the appellate court must affirm the conviction." *Park v. Commonwealth*, 74 Va. App. 635, 654 (2022) (alterations in original) (quoting *Moseley*, 293 Va. at 466). "[M]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide." *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second and third alterations in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)).

Here, we conclude that the trial court did not err in rejecting appellant's alternate hypothesis of innocence that Gale obtained three oxymorphone pills on the date of the offense

from someone other than appellant. The Commonwealth's evidence, viewed in the light most favorable to it, demonstrated that Gale went to appellant's residence with the buy money that Detective Monaghan provided and with the intention of buying oxymorphone pills from appellant. After arriving, Gale gave the money to appellant and returned to Monaghan ten minutes later with three oxymorphone pills. Although Monaghan did not witness the transaction, the audio recording demonstrated that Gale interacted with appellant and that she verbally confirmed that Gale gave her money. While another person was with Gale on his drive to and from appellant's house, and another woman could be heard on the audio recorded inside appellant's home, there was no recorded conversation between these individuals and Gale indicating that he exchanged money or pills with them. Moreover, Monaghan followed Gale to and from appellant's house and searched him before and after the transaction.

Further, during a search of appellant's house, police found "numerous pills," "pill crushers," a "pill press," "numerous prescription bottles for different narcotics, the majority of which were empty," and a "large amount" of currency. Police found $4,351 in a safe in appellant's bedroom, including $270 of the buy money given to Gale. *See Burrell v. Commonwealth*, 58 Va. App. 417, 434 (2011) ("[T]he fact-finder may consider such factors as . . . the presence of equipment or other items related to drug distribution."); *White v. Commonwealth*, 24 Va. App. 446, 453 (1997) ("Considered with other factors, possession of currency by a defendant may be considered in determining whether he or she possessed drugs with an intent to distribute."). Monaghan also described the envelope containing the cash as an "owe sheet[]," an item used by drug dealers "to keep track of drugs that they front or give to people on credit."

In addition, in her interview with Monaghan and at trial, appellant provided inconsistent statements as to the presence of the cash in her safe and whether she distributed pills to others.

At trial, appellant testified that Gale repaid a debt he owed her and made a down payment on certain tools. She also testified that she had been receiving rent from people living with her. That testimony, however, was contradicted by appellant's statements to Monaghan the day after the controlled buy, when she did not mention rental income or Gale making a down payment on tools. Appellant also told Monaghan that only four people lived in the house—herself, her two sons, and a woman named Sue.

Moreover, although appellant repeatedly denied that she sold any pills, she implied the opposite by stating that Gale "comes to me when he runs out" and that he "sells more than I do." When Monaghan told appellant that two of her pills were found on Sue, appellant first claimed that she only gave the pills to Sue so that Sue could give them back later when appellant needed them. She then admitted that she gave pills to Sue for Sue's own use but claimed that she did so only because Sue had a prescription for the same pills.

It is well-established that "[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). Moreover, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)). Here, the record demonstrates that appellant provided vague, inconsistent, and contradictory explanations for the presence of the cash in her safe and as to whether she distributed pills to others. "[A] fact-finder, having rejected a

- 11 -

defendant's attempted explanation as untrue, may draw the reasonable inference that his explanation was made falsely in an effort to conceal his guilt." *Covil v. Commonwealth*, 268 Va. 692, 696 (2004).

Based on the evidence above—including Monaghan's search of Gale before and after the controlled buy and his receipt of the pills from Gale; the audio recording reflecting the exchange of money between Gale and appellant; the buy money found in appellant's safe; the items indicative of drug distribution found in appellant's home; and appellant's inconsistent statements and statements indicating that she distributed drugs—it is clear the trial court was not plainly wrong in concluding that the evidence was sufficient to support appellant's conviction.

Appellant urges us on appeal to discount this evidence and instead focus on the presence of individuals other than appellant and Gale during the controlled buy. In support of her argument that the trial court unreasonably rejected her alternate hypothesis of innocence that the woman in the car with Gale or the other woman in the house supplied Gale with the pills, appellant cites to two decisions of this Court, *Jones*, 21 Va. App. 435, and *Bennett*, 69 Va. App. 475. Yet, a review of these cases demonstrates that, contrary to appellant's argument, they in fact support the conclusion that the circumstantial evidence in this case was sufficient to support appellant's conviction. In both cases, confidential informants involved in controlled buys of drugs did not testify at trial. *Jones*, 21 Va. App. at 441-42; *Bennett*, 69 Va. App. at 479. Nonetheless, our Court affirmed both drug distribution convictions based on the other circumstantial evidence presented at trial. *Jones*, 21 Va. App. at 444; *Bennett*, 69 Va. App. at 495.

In *Jones*, police searched the confidential informant, provided him with buy money for a controlled buy, and then drove him to an unspecified location near a restaurant where the transaction was to occur. 21 Va. App. at 438. Police lost sight of the confidential informant

until he walked through an alley into the restaurant's parking lot. *Id.* at 438-39. They saw the confidential informant and the defendant meet in the lot, but lost sight of both of them when they "momentarily" walked in front of the restaurant. *Id.* at 439. During this time, police could not see whether the confidential informant "went into the restaurant or met other persons." *Id.* There were also "other restaurant patrons . . . in the area" at the time. *Id.* After leaving the front of the restaurant, the confidential informant and the defendant were seen entering the defendant's car, and the confidential informant left the car after a "short time." *Id.* Police saw the confidential informant walk toward where he was to meet other police officers, but did not see the meeting. *Id.* Police did not see an exchange of money or drugs between the defendant and the confidential informant. *Id.* at 438-39. Our Court affirmed the defendant's conviction, noting that the evidence established that before meeting with the defendant, the confidential informant did not possess any drugs and had $2,500 in currency and that after meeting with the defendant "for the purpose of purchasing drugs," the confidential informant no longer had the $2,500 but did possess two ounces of cocaine. *Id.* at 444. We held that "[t]he fact that the officers did not have [the confidential informant] under surveillance the entire time he was away from [the officers] does not establish a reasonable hypothesis that someone other than [the defendant] was the source of the cocaine." *Id.*

In *Bennett*, police used a "live" audio feed to monitor the controlled buy and made and reviewed additional audio and video recordings of the transaction. 69 Va. App. at 480. The confidential informant called the defendant, and during this call mentioned slang terms for tobacco cigarettes dipped in PCP and crack cocaine. *Id.* at 480-81. After this call, and a subsequent call during which the defendant told the confidential informant where to meet him, police observed the informant until he entered an apartment complex. *Id.* at 481. After the confidential informant was out of sight, police heard the informant's and the defendant's voices

- 13 -

on the live audio feed, as well as other unidentified voices. *Id.* The video recording showed the confidential informant encountering two different people inside the residence—a woman who was "fleetingly" visible in the living room at the beginning of the video, and the defendant who was visible during the remainder of the video. *Id.* at 482. The video showed the defendant holding a plastic sandwich bag and two slightly discolored cigarettes. *Id.* Affirming the trial court's conviction, our Court noted that "investigators searched the informant before and after the transaction, monitored his movements throughout the relevant period of time, and kept him in view except for the period during which he met the [defendant]." *Id.* at 494-95.

These decisions provide the holding, relevant here, that lapses in police surveillance or the presence of other individuals during controlled buys do not render the evidence insufficient when the confidential informant fails to testify at trial. Instead, as in all circumstantial evidence cases, the determination of whether an alternative hypothesis of innocence is reasonable is one made by the fact finder below upon consideration of the totality of the circumstances and is one that we do not disturb on appeal unless plainly wrong. *Wood*, 57 Va. App. at 306. Accordingly, we conclude, as in *Jones* and *Bennett*, that the fact that Gale was not under surveillance during the entirety of the controlled buy and that other individuals were present during the buy did not make the trial court's rejection of her alternate hypothesis of innocence unreasonable.[6]

The trial court, sitting as fact finder, "determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Moseley*, 293 Va. at 464. Appellant has failed to show that the trial court's rejection of her alternative hypotheses of innocence was "plainly wrong." *Wood*, 57

---

[6] In addition, we note that the evidence in this case is strengthened by a fact not present in either *Jones* or *Bennett*—here, an exchange of money between appellant and Gale was acknowledged by appellant during the audio recording.

Va. App. at 306.  Therefore, we conclude that the trial court did not err in convicting her of the

charged offense.[7]

### III.  CONCLUSION

For the reasons stated above, the trial court did not err in convicting appellant of

distribution of a Schedule I or II controlled substance.  Accordingly, we affirm the judgment of

the trial court.

*Affirmed.*

---

[7] We acknowledge that, as noted above, in circumstantial evidence cases, the Commonwealth must establish "an unbroken evidentiary chain of necessary circumstances" to prove the defendant's guilt beyond a reasonable doubt.  *Moseley*, 293 Va. at 463.  However, this language does not mean that the circumstantial evidence here is insufficient because Monaghan lost sight of Gale while Gale was in appellant's home or because other individuals can be heard on the audio recording of the controlled buy.  Those particular facts do not "break" the chain of circumstantial evidence linking appellant to the offense in this case.  Our case law is clear on this—if circumstances indicating that persons other than the defendant were present during a controlled buy meant that the evidentiary chain was "broken," then our Court would have had to reverse the convictions in *Jones* and *Bennett*.  Instead, properly viewed, the fact finders in *Jones* and *Bennett*, as well as the trial court here, were allowed to view the evidence in its entirety and determine whether the defendant's alternate hypothesis of innocence was reasonable in light of all the circumstances presented to the court.

Reviewing the Commonwealth's evidence, we find that it clearly established an unbroken chain linking appellant to the distribution of oxymorphone to Gale.  Each piece of circumstantial evidence described above provided a circumstance upon circumstance from which the fact finder could rationally conclude that appellant sold the pills to Gale.  "While no single piece of [circumstantial] evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'"  *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (en banc) (alteration in original) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)).

Chaney, J., with whom Causey, J., joins, dissenting.

The trial court convicted appellant, Teresa Maust (defendant), of distributing three oxymorphone pills to a police informant, although the evidence was insufficient to support a finding that defendant distributed the pills that police obtained from the informant. Considering the totality of the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth, substantial gaps in the chain of evidence render the wholly circumstantial evidence insufficient for any rational fact-finder to find beyond a reasonable doubt that defendant, and not some other person, distributed the oxymorphone pills recovered from the informant. Therefore, we respectfully dissent from the majority's opinion affirming defendant's conviction for distribution of a Schedule II controlled substance in violation of Code § 18.2-248.

## BACKGROUND

On October 1, 2018, Detective Monaghan obtained three oxymorphone pills from a paid police informant who died before trial, making him unavailable to testify.[8] Consequently, there was no eyewitness testimony about the informant's interaction with defendant on the alleged offense date. The police did not observe the informant's interaction with defendant, and there was no video recording of their interaction. The police had no live audio feed of the informant's activities and communications with defendant. The only evidence of the informant's interaction with defendant on the date of the alleged offense, October 1, is a poor-quality audio recording from the recording device that police wired to the informant. The detective testified that parts of the audio recording recovered from the informant sounded "very garbled." At various points while the recording was played at trial, the trial court observed that nothing intelligible could be heard.

---

[8] The informant had previously acted as a police informant to "work off charges." Here, the police were paying the informant. When he worked for money, the police usually paid the informant $100 per investigation.

- 16 -

Before the informant drove to defendant's house on October 1, the detective met with the informant to provide him with the recording device and $320. Before giving the money to the informant, the detective recorded each bill's denomination and serial number. The detective gave the informant $300 to buy three oxymorphone pills and an additional $20 to repay a $16 debt the informant claimed he owed defendant. To ensure that any drugs eventually recovered from the informant were obtained from defendant and not another source, the detective (i) searched the informant's person and vehicle before the informant drove to defendant's house, (ii) wired the informant with an audio recording device, and (iii) followed the informant's vehicle most of the way to and from defendant's house.

The informant was a drug addict and a convicted felon with a lengthy criminal record. The detective instructed the informant to drive to defendant's house and purchase oxymorphone pills with "buy money" from the sheriff's department.

The audio recording recovered from the informant demonstrated that an unidentified person was in the informant's vehicle conversing with him during his drive to and from defendant's house. There is no evidence that the police ever searched the informant's driving companion, and no evidence that the police were even aware of the presence of the informant's driving companion during the "controlled buy."

When the detective followed the informant's vehicle to defendant's house, he lost sight of the informant after the informant drove up defendant's driveway. The detective could not see the informant's vehicle at the end of the driveway, nor could he see the informant enter or exit defendant's house. Other vehicles were parked in defendant's driveway while the informant was at defendant's house. The detective testified that he did not know how many people were in defendant's house while the informant was there on October 1, 2018. The informant's audio recording demonstrated that at least two persons other than defendant were present in defendant's

house while the informant was there, and at least one of them communicated with the informant. The recording also indicates that before the informant drove away from defendant's house, he was out of defendant's presence for a continuous period of approximately two minutes. The evidence does not establish the whereabouts of the informant's driving companion during the approximate ten-minute period when the informant was inside defendant's house.

After the informant and defendant exchanged greetings, following some static and unintelligible communications on the audio recording, the informant exchanged greetings with an unidentified male. The recorded conversation between the informant and defendant promptly turned to the subject of appliances that defendant was selling. Then the informant briefly went outside to his vehicle to retrieve the money he left there. When the informant returned, he stated that he owed defendant $14 and asked if she had change. He gave defendant some money and after they both commented on the "old style" of the bills, defendant said "two forty and four." Then they resumed the conversation about appliances, and the informant asked to see the stove and refrigerator. The informant also stated that his current stove wasn't working properly.

As the informant is heard moving to the location of the appliances, he greeted another unidentified person. After additional conversation about the appliances, the informant took pictures of them. As the informant was taking pictures, defendant stated, "I owe you six bucks, right? You owe me two fifty four." The informant replied, "Sixteen." Defendant responded, "Two fifty four. And you gave me two seventy." A moment later, defendant said, "Let me get change." Defendant made some additional remarks about the worth of the appliances and then said, "Give me a second." The informant replied that he would be outside. While the informant was near the appliances, the sound of an unidentified woman talking was twice recorded.

The next communication between defendant and the informant was about two minutes later. During the intervening two minutes, the informant was recorded moving outside and then talking.

- 18 -

Some other unidentifiable sounds of movement were also recorded. When defendant returned with the informant's change, the informant told defendant that both his mother and sister may also be interested in the appliances.

After the informant left defendant's house, he and the detective separately drove back to the same commuter lot where they had met earlier that day. The detective retrieved the audio recording device and again searched the informant's person and vehicle. The informant did not have any of the buy money, but he did have $16 in cash which was not part of the buy money— the same amount that the informant stated he was owed in change after giving defendant $270. The informant also turned over three pills that were subsequently found to contain oxymorphone, a Schedule II controlled substance.

The next day, on October 2, 2018, the detective executed a search warrant at defendant's house. The police found numerous pills, a pill press or pill crusher, and "numerous prescription bottles for different narcotics, the majority of which were empty." Some pills that were found were prescribed to defendant, and others were prescribed to her female tenant.

While the search of defendant's house was underway, defendant arrived home with her female tenant. Defendant gave the detective the combination to a safe that was found in her bedroom. Defendant told the detective that some money in the safe may have been money that the informant had borrowed and repaid to her.

When the detective interviewed defendant during the search, defendant stated that the residents of her house included herself, her two adult sons, and her female tenant. Defendant initially denied any involvement in narcotics dealing. Defendant told the detective that she had legitimate prescriptions for an injury. Defendant stated that her ex-husband would steal and sell her prescribed pills, but she acknowledged that her ex-husband had moved out the month before. Defendant admitted that sometimes she lends pills to her friends if they run out, but she denied

selling pills. The detective informed defendant that such distribution of controlled substances is also illegal. In response to the detective's statement that "we purchased these pills," defendant replied that any money she received from the informant was for payment of a debt. Defendant stated, "I don't know why you're bothering me, he's a way bigger dealer than I am."

The police found $4,351 in the safe, including $270 of the buy money that the detective gave the informant. The detective testified that "there was sixteen one hundred dollar bills, there were twenty-seven fifty dollar bills, there were fifty-nine twenty dollar bills, there were eighteen ten dollar bills, there were [eight five] dollar bills, and there was one one dollar bill which totaled up to four thousand, three hundred and fifty-one." The police found an additional $138 elsewhere in defendant's bedroom.

All the money in the safe was inside an envelope with writing on it that included the following notations,[9] arranged in two columns:

| | |
|---|---|
| B = 11 | 1100 |
| G = 17 | 850 |
| J = 121 | 2420 |
| H = 25 | 250 |
| L = 19 | 95 |
| | 4710 |

The detective characterized the writing on the envelope as an "owe sheet" used to keep track of drugs given out on credit. The detective also testified that the numbers next to the letters could represent pills or money. Defendant testified that the writings on the envelope were a record of her prior count of the money in the envelope. Defendant explained that each letter represented the denomination of the bills, e.g., "B" for Benjamin, "H" for Hamilton, and "L" for Lincoln. Defendant testified that the second column was the tally of the money. When defendant's counsel attempted to argue that the initials on the purported owe sheet represent denominations

_____

[9] On Commonwealth's Exhibit 3, the top portion of the first number in the second column is obscured by an evidence sticker, but the number appears to be "1100."

of United States currency, the trial court interrupted her closing argument stating, "Ms. Coleman, nobody does that."[10] This finding followed the detective's testimony showing that the detective counted the money from the safe by counting the number of bills in each denomination and adding these amounts together to determine the total amount.

Applying elementary arithmetic to the information in the above table, 11 "Benjamins," i.e., 11 one-hundred-dollar bills, amounts to $1100, as stated on the first line in the second column; 17 "Grants," i.e., 17 fifty-dollar bills, amounts to $850, as stated on the second line in the second column; 121 "Jacksons," i.e., 121 twenty-dollar bills, amounts to $2,420, as stated on the third line in the second column; 25 "Hamiltons," i.e., 25 ten-dollar bills, amounts to $250, as stated on the fourth line in the second column; and 19 "Lincolns," i.e., 19 five-dollar bills, amounts to $95, as stated on line five in the second column. When the numbers in the second

---

[10] The trial court unreasonably rejected defendant's explanation that the writing on the envelope containing cash was a recorded count of money by currency denominations, not an "owe sheet." First, it is highly unlikely that individuals on the purported "owe sheet" would have identifying initials coinciding exactly with the first letters of the "nicknames" of currency denominations: B, J, G, H, and L. In addition to it being highly improbable that B, J, G, H, and L are the initials of five individuals chosen at random, it is even more unlikely that those five individuals would owe amounts that correspond precisely with multiples of the currency denomination identified by their initial. As can be confirmed by simple counting and use of elementary arithmetic, only 1 in 5 numbers are multiples of 5; only 1 in 10 numbers are multiples of 10; only 1 in 20 numbers are multiples of 20; only 1 in 50 numbers are multiples of 50; and only 1 in 100 numbers are multiples of 100. It is extremely unlikely that the amounts owed by all five individuals would be exact multiples of the currency denomination corresponding to their initial. In contrast, the hypothesis of innocence that the notations are a recorded count of cash money by currency denominations is a complete explanation of the letters and corresponding numbers on the envelope.

Because it is so highly improbable that the notations on the envelope are an "owe sheet" and not a recorded count of money by currency denominations, the trial court erred by arbitrarily rejecting defendant's innocent explanation of the notations. *See Wright v. Commonwealth*, 292 Va. 386, 397 (2016) ("[W]here a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused]." (alterations in original) (quoting *Commonwealth v. Smith*, 259 Va. 780, 782 (2000))).

column are added together, the sum is 4,715, approximately the same as the number on the sixth line in the second column beneath the horizontal line, i.e., 4710.

Defendant testified that on October 1, 2018, the informant came to her house to look at appliances that she was selling and to give her "a down payment for a pancake compressor and a framing nail gun." Defendant also testified that the informant paid her back around $150 that he had borrowed.

ANALYSIS

Considering the totality of the evidence, the evidence is insufficient to sustain the conviction for drug distribution because no rational fact-finder can find beyond a reasonable doubt that the wholly circumstantial evidence formed an unbroken chain of necessary circumstances linking defendant to the crime of distributing the three oxymorphone pills recovered from the informant. In other words, the evidence as a whole failed to exclude the reasonable hypothesis of innocence that the informant obtained the oxymorphone pills from someone other than defendant. According to our Supreme Court's longstanding precedent,

> Where the evidence is entirely circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means and conduct must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt.

*Brown v. Commonwealth*, 238 Va. 213, 220 (1989) (quoting *Bishop v. Commonwealth*, 227 Va. 164, 169 (1984)). "While a conviction may properly be based upon circumstantial evidence, suspicion or even probability of guilt is not sufficient." *Gordon v. Commonwealth*, 212 Va. 298, 300 (1971). "[E]vidence that raises no more than a suspicion of guilt 'no matter how strong, is insufficient to sustain a criminal conviction.'" *Wright v. Commonwealth*, 292 Va. 386, 397 (2016) (quoting *Stover v. Commonwealth*, 222 Va. 618, 624 (1981)). Proof of a mere opportunity to

commit an offense provides only "the suspicion that the defendant may have been the guilty agent; and suspicion is never enough to sustain a conviction." *Simmons v. Commonwealth*, 208 Va. 778, 783 (1968).

Here, substantial gaps in the chain of evidence preclude a finding by a rational fact-finder that defendant distributed the three oxymorphone pills recovered from the informant. A fatal gap in the chain of necessary circumstances exists because the informant's acquisition of the oxymorphone pills was not "controlled" by the detective. The unexplained presence of the informant's unsearched driving companion defeated the detective's purpose in searching the informant and his vehicle before he met with defendant. Given this break in the chain of necessary circumstances, a rational fact-finder cannot find beyond a reasonable doubt that defendant distributed the drugs recovered from the informant.

Additional gaps in the chain of evidence were created by the gaps in audio surveillance due to the poor quality of the audio recording recovered from the informant. As the detective testified, parts of the recorded audio were "very garbled" due to static or other issues. As the trial court observed, some parts of the recorded audio emitted no sound.

Another fatal gap in the chain of circumstances necessary to prove defendant's criminal agency relates to the informant's unmonitored access to two persons other than defendant when the informant was inside defendant's house. The informant's recording device recorded the voices of two persons other than defendant inside defendant's house. A male voice was recorded exchanging greetings with the informant. A female voice was twice recorded in the informant's company just before the informant announced that he would wait for defendant outside. Additionally, the informant's recording had several unintelligible garbled segments, creating gaps in the audio surveillance. Based on the totality of evidence, a rational fact-finder could not find that the informant "could not have obtained the [controlled substance] from a source other than the

- 23 -

defendant." *Jones v. Commonwealth*, 21 Va. App. 435, 443 (1995) (en banc) (affirming conviction for drug distribution to a police informant where the circumstantial evidence did not establish that the informant had access to someone other than defendant at the time of the controlled drug buy). Given the informant's access to persons other than defendant between the time the detective initially searched the informant and the time the detective recovered the drugs from the informant, there is a fatal break in the chain of circumstances necessary to support a finding that defendant, and not someone else, distributed the drugs recovered from the informant. Because the informant's drug acquisition was not "controlled," a rational fact-finder's consideration of the totality of the evidence precludes a finding beyond a reasonable doubt that defendant distributed the oxymorphone pills in evidence.

Additional evidence of the uncontrolled nature of the informant's activities is the discrepancy between the amount of money that the detective recovered from the informant and the amount of money that the informant should have returned to the detective. According to the recorded conversation between the informant and defendant, (i) the informant owed defendant money, (ii) the informant gave defendant $270, and (iii) defendant gave the informant $16 in change. The detective found the $270 that the informant gave defendant in defendant's safe. The detective recovered $16 from the informant that was not from the set of dollar bills that the detective gave the informant. Given that the detective gave the informant $320 and the informant paid defendant $254, the informant should have returned $66 to the detective. But after searching the informant and his vehicle, the detective recovered only $16. The evidence demonstrates that during the purportedly controlled buy, the informant was able to conceal or transfer $50 without notice by the detective. Given this, no rational fact-finder could find from the evidence that the informant could not have retrieved the three oxymorphone pills from somewhere or obtained them from someone other than defendant. *See id.* (affirming drug distribution conviction based on

- 24 -

circumstantial evidence of criminal agency because the evidence supported a finding that the informant "could not have obtained the [controlled substance] from a source other than the defendant").

Although the undisputed evidence supports the trial court's finding that defendant "engaged in some kind of financial transaction," the evidence is insufficient to support a finding that this was a drug transaction. In holding otherwise, the majority mistakes speculative suspicion for reasonable inference. The only evidence that defendant gave the informant something after receiving $270 from him is the evidence that she gave him $16. On the informant's audio recording, defendant stated that the informant owed her $254 and the informant stated that she owed him $16 back after he gave her $270. The totality of the evidence does not support a finding beyond a reasonable doubt that this was a drug transaction.

Even if the evidence supports a finding that defendant was a drug dealer, fatal gaps in the chain of evidence preclude a rational fact-finder from finding beyond a reasonable doubt that defendant distributed the three oxymorphone pills recovered from the informant. Defendant was not on trial for being a drug dealer, but for distributing the oxymorphone pills recovered from the informant on October 1, 2018. Proof that a defendant is a drug dealer is insufficient to support an inference that the defendant sold drugs to a particular individual on a specific date as charged. The totality of the evidence is insufficient to prove defendant's criminal agency with respect to the charged distribution offense given the substantial gaps in the chain of circumstances necessary for such proof. Taking all the evidence in the light most favorable to the Commonwealth, the evidence does not point unerringly to defendant as the source of the pills recovered from the informant. Considered as a whole, the evidence creates no more than mere suspicion or probability of defendant's guilt. "[T]o sustain a criminal conviction, the Commonwealth is required to prove more than a suspicion of guilt or probability of guilt."

- 25 -

*McMorris v. Commonwealth*, 276 Va. 500, 506 (2008).  Under this standard, the conviction should be reversed.

## CONCLUSION

The totality of the evidence does not form an unbroken chain of circumstances necessary for a rational fact-finder to find beyond a reasonable doubt that defendant—and not someone else—distributed the oxymorphone pills recovered from the informant.  Therefore, we respectfully dissent from the judgment affirming the conviction for distribution of a Schedule II controlled substance.

# VIRGINIA:

*In the Court of Appeals of Virginia on*   **Tuesday**   *the* **30th** *day of* **August, 2022**.

Teresa Mary Maust,                                          Appellant,

 against          Record No. 0505-21-4
                     Circuit Court No. CR19000465-02

Commonwealth of Virginia,                                 Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On August 22, 2022 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on August 9, 2022, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the petition for rehearing *en banc* is granted and the appeal of those issues is reinstated on the docket of this Court. The mandate previously entered herein is stayed pending the decision of the Court *en banc*.

The parties shall file briefs in compliance with the schedule set forth in Rule 5A:35(b). The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter. An electronic version of each brief shall be filed with the Court and served on opposing counsel.[1]

A Copy,

Teste:

A. John Vollino, Clerk

By:    *original order signed by a deputy clerk of the*
        *Court of Appeals of Virginia at the direction*
        *of the Court*
        Deputy Clerk

---

[1] The guidelines for filing electronic briefs and appendices can be found at www.courts.state.va.us/online/vaces/resources/guidelines.pdf.

Present:   Judges Malveaux, Causey and Chaney
Argued by videoconference

TERESA MARY MAUST

v.        Record No. 0505-21-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE VERNIDA R. CHANEY
AUGUST 9, 2022

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Bruce Strickland, Judge[1]

Andrew J. Cornick (Andrew J. Cornick, LLC, on brief), for
appellant.

Timothy J. Huffstutter, Assistant Attorney General (Mark R.
Herring,[2] Attorney General, on brief), for appellee.


Teresa Mary Maust ("Maust") appeals from the judgment of the Circuit Court of Stafford

County ("trial court") convicting and sentencing her for felony distribution of a Schedule I or II

controlled substance, in violation of Code § 18.2-248.  Maust was sentenced to confinement for a

period of five years with all but three months suspended for five years.  On appeal, Maust

contends that the trial court erred as a matter of law in finding that the circumstantial evidence

reasonably excluded Maust's hypothesis of innocence and proved beyond a reasonable doubt that

Maust distributed oxymorphone on October 1, 2018.  For the following reasons, this Court

reverses the trial court's judgment.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication

[1] Judge J. Bruce Strickland entered the final sentencing order in this case.  Judge Charles
S. Sharp conducted Maust's trial, found her guilty, and entered the conviction order.

[2] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

I.  BACKGROUND

A.  The Investigation of Maust

i.  *Staging the Investigation*

On October 1, 2018, at around 5:00 p.m., Stafford County Detective Shawn Monaghan ("the detective") met with Robert Gale ("Gale"), a paid informant, at a "staging area" in a commuter parking lot to conduct a narcotics investigation.[3] Maust was the target of the investigation. Gale was a drug addict whose "drug of choice" was opiates. Gale was also a convicted felon with a lengthy criminal record.

The detective instructed Gale to drive to Maust's residence and purchase opioid pills from her with "buy money" from the sheriff's department. The detective gave Gale $300 to buy three opioid pills at $100 per pill, plus an additional $20 because Gale said he owed Maust $16. Before the detective gave the buy money to Gale, the detective recorded the denominations and serial numbers.

The detective searched Gale's person and vehicle for drugs and money to ensure that he was not bringing any drugs or other money to Maust's residence. The detective equipped Gale with an on-person audio recording device and followed Gale's vehicle to and from Maust's residence in Stafford County. However, the detective was unable to hear live audio of Gale's activities and communications.

While following Gale, the detective lost sight of him after he drove up the driveway to Maust's house. The detective could not see Gale's vehicle at the end of the driveway, nor could he see Gale enter or exit Maust's house. The detective observed other cars in the driveway. The detective did not recall whether there were any cars in the garage. The detective maintained a

_____

[3] Gale had previously acted as a police informant to "work off charges." On this day, the police were paying Gale for his informant work. When he worked for money, the police usually paid Gale $100 per investigation.

physical distance from Maust's residence to avoid being seen by anyone in Maust's house. The detective testified that he did not know how many people were in Maust's house while Gale was there on October 1, 2018.

ii. *The Evidence Recovered from Gale*

The audio recording recovered from Gale recorded Gale talking with an unidentified person ("Gale's companion") who was in the car with Gale after 5:00 p.m. during the drive to and from Maust's house. During the recorded conversation, Gale mentioned that he and his companion had also been driving together in the car that morning.[4] During the drive to Maust's house, a few minutes before Gale arrived there, Gale instructed his companion, "Text her and say here." There is no evidence of the whereabouts of Gale's companion while Gale was inside Maust's house.

Gale's recorded conversation with Maust began with a greeting and promptly turned to the subject of appliances that Maust was selling from her home. Gale told Maust to "hold on for a second," and he apparently went to his car to retrieve the money.

When Gale returned, he said, "I owe you the fourteen dollars. Do you have change?" After Maust and Gale both commented on the "old style" of the bills, Maust replied, "two forty and four." Gale responded, "Ok." Then Maust and Gale resumed discussion of the appliances that Maust was selling.

Following some static and garbled transmission on the audio recording, Gale was recorded exchanging greetings with an unidentified person.

Maust and Gale continued to discuss the appliances for sale, and Maust told Gale they were being sold "first come, first served." As Gale took pictures of the appliances, Maust said,

---

[4] Gale commented on a noise from the car and told his companion, "Remember, we were hearing it this morning."

"I owe you six bucks, right? You owe me two fifty four." Gale replied, "Sixteen." Maust responded, "Two fifty four. And you gave me two seventy."

When Gale finished taking pictures of the appliances, the voice of another woman was recorded. Maust and Gale continued to talk about the price of the appliances. Maust told Gale that she would let people take whatever was left after she removed what she wanted. When Maust asked Gale to give her a second, Gale said he would wait outside. Then the aforementioned woman's voice is heard again on the recording.

The audio recording indicates that Maust rejoined Gale about two minutes after Gale said he would wait outside. Maust told Gale that the appliances would likely sell quickly and suggested that Gale's mother might want them. Gale replied that both his mother and sister may be interested in the appliances.

About ten minutes after Gale drove up Maust's driveway, Gale drove out of the driveway and back to the commuter lot, making no unscheduled stops. On the drive back, Gale was recorded telling his companion about the appliances that Maust was selling. The detective followed Gale's car back to the commuter lot where he again met with Gale.

The detective retrieved the audio recording device from Gale and again searched his person and vehicle. Gale did not have any of the buy money, but he did have $16 in cash which was not part of the buy money. Gale also turned over three round orange tablets imprinted with "G74." Subsequently, one of these pills was analyzed by the Virginia Department of Forensic Science ("DFS") and "was found to contain Oxymorphone, [a] Schedule II [controlled substance]." Based on visual examination of the other two pills, DFS concluded that their shape, color, and manufacturer's markings were "consistent with a pharmaceutical preparation containing Oxymorphone."

### iii. *The Search of Maust's House*

The next day, on October 2, 2018, the detective executed a search warrant at Maust's house. The police found numerous pills, a pill press or pill crusher, and "numerous prescription bottles for different narcotics, the majority of which were empty." Some pills that were found were prescribed to Maust and others were prescribed to her tenant, Susan Stone.

While the search of Maust's house was underway, Maust arrived home with Ms. Stone. Maust gave the detective the combination to a safe that was found in her bedroom. The detective did not find out whether any other occupants of the house knew the combination to the safe.

Maust told the detective that she got the safe to keep her ex-husband away from her money. Maust said that she had withdrawn money from her bank account and placed it in the safe because she was planning to move. Maust also stated that some money in the safe may have been money that Gale had borrowed and repaid to her.

The police found $4,351 in the safe, including $270 of the buy money given to Gale. The detective testified that "there was sixteen one hundred dollar bills, there were twenty-seven fifty dollar bills, there were fifty-nine twenty dollar bills, there were eighteen ten dollar bills, there were [eight five] dollar bills, and there was one one dollar bill which totaled up to four thousand, three hundred and fifty-one." The police found an additional $138 elsewhere in Maust's bedroom.

All the money found in the safe was inside an envelope that had writing on it. The writing on the envelope included the following notations, arranged in a column: "B = 11," "G = 17," "J = 121," "H = 25," and "L = 19." To the right of this list was a column of numbers: "1100,[5] 850, 2420, 250, 95, 4710." The first five of these numbers in the column appeared

---

[5] On Commonwealth's Exhibit 3, the top portion of the first number in the second column is obscured by an evidence sticker, but the number appears to be "1100."

above a horizontal line and the last number was below the line. In the detective's testimony, he characterized the writing on the envelope as an "owe sheet" which is used to keep track of drugs given out on credit. The detective also testified that the numbers next to the letters could represent pills or money.

Maust testified that the writings on the envelope were a record of her prior count of the money in the envelope. Maust explained that each letter represented the denomination of the bills, e.g., B for Benjamin, H for Hamilton, and L for Lincoln.[6] Maust testified that the second column was the tally of the money.

iv. *Maust's Additional Statements and Testimony*

When the detective interviewed Maust during the search on October 2, 2018, Maust stated that the residents of her house included herself, her two adult sons, and Susan Stone. Maust initially denied any involvement in narcotics dealing. Maust told the detective that she had legitimate prescriptions for an injury. Maust stated that her ex-husband would steal and sell the pills prescribed to her, but she acknowledged that her ex-husband had moved out the month before. Maust admitted that sometimes she lends pills to her friends if they run out, but she denied selling pills. The detective informed Maust that such distribution of controlled substances is also illegal. In response to the detective's statement that "we purchased these pills," Maust replied that any money she received from Gale was for payment of a debt. Maust stated, "I don't know why you're bothering me, he's a way bigger dealer than I am."

At trial, Maust testified that Gale rarely came to her home since she and Gale stopped dating. Maust testified that on October 1, 2018, Gale came to her house to look at appliances

---

[6] Maust testified that she only used the method of counting bills by denominations once out of boredom a year and a half ago and that she "would have to actually look at the bills to tell you what it meant." The record indicates that Maust was not shown bills in the different denominations to refresh her recollection.

that she was selling and to give her "a down payment for a pancake compressor and a framing nail gun." Maust testified that Gale also paid her back around $150 that he had borrowed. Maust acknowledged that the audio recording from Gale recorded Maust indicating that she received $270 from Gale.

Maust testified that she did not sell drugs to Gale on October 1, 2018. Maust also testified that when Gale was in her house that day, she did not recall "exactly everybody that was in the house," but she believed that several others were there, including her oldest son and two other tenants, Stone and Matt Herbigg. Maust identified Susan Stone's voice as the other female voice on the audio recording from Gale. Maust testified that every time Gale came over, he would have a private conversation with Susan Stone, but she could not recall whether Gale met separately with Ms. Stone on October 1, 2018. Maust testified that she did not see Gale take three pills from anywhere in the residence.

v. *No Testimony from Informant Gale*

Gale died before Maust's bench trial in February 2020.

B. The Trial Court's Findings

At trial, the trial court made the following findings on the record:

- No contraband was uncovered when the police initially searched Gale, and the searching protocol was sufficient to have made that judgment.

- Gale "went into the home occupied by Ms. Maust, and for a period of approximately ten minutes was inside the house."

- The audio recording recovered from Gale sounded "very garbled." At various points while the recording was played at trial, the trial court noted that nothing could be heard.

- The recorded conversation included discussion about a washer and dryer.

- The audio recording included "what purports to be an exchange of money."

-  Maust's voice was identified on the recording "engaged in some kind of financial transaction, there's an exchange of money inside her house."

- 7 -

- "As a consequence of the audio, the only substantive conversation between any two people in the house was that between the informant and Ms. Maust, whose voice was identified by the officer."

- "In the course of the relatively garbled transmission, one thing is clear, that at some point there was an exchange of cash money."

- After Gale left Maust's house, "upon subsequent search by the officer discovered (a) no longer to have that buy money and (b) to have in his possession three pills which are without dispute contraband[,] . . . [i.e.,] opioids . . . ."

- "[T]he Court has before it a period of ten minutes in which there was an exchange of money and drugs, and the only evidence of contact between any two persons is that between the informant, who's no longer with us, and Ms. Maust."

- "A subsequent search warrant being executed, the money that was distributed or given to the informant and then later handed over presumably to Ms. Maust was found in a safe to which [other people] ha[ve] relatively little access, or rather it's limited to other people."

- When Maust's counsel attempted to argue that the initials on the purported owe sheet represent denominations of United States currency, the trial court interrupted her closing argument stating, "Ms. Coleman, nobody does that."

- "The only reasonable inference to be drawn from that set of circumstances is that the transaction went down exactly as has been argued by the Commonwealth. And whether she gave, sold, distributed at a discount, or whatever the case may be, the Court is convinced beyond any reasonable doubt that the Commonwealth has met its burden."

The trial court found Maust guilty of distribution as charged in the indictment. This appeal followed.

## II. ANALYSIS

### A. Standard of Review

On appellate review of a criminal conviction, this Court "consider[s] the evidence and all reasonable inferences flowing from that evidence in the light most favorable to the Commonwealth, the prevailing party at trial." *Pooler v. Commonwealth*, 71 Va. App. 214, 218 (2019) (quoting *Williams v. Commonwealth*, 49 Va. App. 439, 442 (2007) (*en banc*)). We "discard the evidence of the accused *in conflict* with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn

therefrom." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (emphasis added) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)). The conviction will be affirmed "unless it is plainly wrong or without evidence to support it." *Sarka v. Commonwealth*, 73 Va. App. 56, 62 (2021) (quoting *Austin v. Commonwealth*, 60 Va. App. 60, 65 (2012)).

"[W]here a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused]." *Wright v. Commonwealth*, 292 Va. 386, 397 (2016) (alterations in original) (quoting *Commonwealth v. Smith*, 259 Va. 780, 782 (2000)).

"[W]here, as here, a conviction is based on circumstantial evidence, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.'" *Garland v. Commonwealth*, 225 Va. 182, 184 (1983) (quoting *Carter v. Commonwealth*, 223 Va. 528, 532 (1982)). "While a conviction may properly be based upon circumstantial evidence, suspicion or even probability of guilt is not sufficient." *Gordon v. Commonwealth*, 212 Va. 298, 300 (1971); *see also Wright*, 292 Va. at 397 ("evidence that raises no more than a suspicion of guilt 'no matter how strong, is insufficient to sustain a criminal conviction'" (quoting *Stover v. Commonwealth*, 222 Va. 618, 624 (1981))).

To establish proof beyond a reasonable doubt, "the *chain of necessary circumstances must be unbroken* and the evidence as a whole must satisfy the guarded judgment that both the *corpus delicti* and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty." *Wright*, 292 Va. at 397 (quoting *LaPrade v. Commonwealth*, 191 Va. 410, 418 (1950)). Proof of a mere opportunity to commit an offense provides only "the suspicion that the defendant may have been the guilty agent; and suspicion is never enough to sustain a conviction." *Simmons v. Commonwealth*, 208 Va. 778, 783 (1968).

B.  Insufficient Evidence of Drug Distribution by Maust to the Paid Informant

The Commonwealth's case against Maust did not include any witness testimony identifying Maust as the source of the oxymorphone pills recovered from Gale, the paid informant who died before trial.  To sustain a conviction for drug distribution under these circumstances where the Commonwealth relies on circumstantial evidence, the Commonwealth's evidence must show that the informant "*could not have obtained the [controlled substance] from a source other than the defendant*."  *Jones v. Commonwealth*, 21 Va. App. 435, 443 (1995) (*en banc*) (emphasis added).  Absent a showing that Gale had no opportunity to obtain the controlled substance from someone other than Maust, there is a fatal break in the chain of necessary circumstances and the evidence fails to prove beyond a reasonable doubt that Maust distributed the oxymorphone pills to Gale.

In *Jones*, this Court considered whether the evidence was sufficient to support the defendant's conviction for cocaine distribution where the police informant who allegedly bought cocaine from the defendant was unable to testify about the alleged drug purchase.  *Id.* at 440.  We concluded that "[t]he circumstantial evidence in this case points unerringly to the fact that [the defendant] was the person who sold cocaine to [the police informant]."  *Id.* at 442.  The following facts supported this conclusion:  A meeting between the defendant and a police informant was arranged "for the purpose of purchasing drugs."  *Id.* at 444.  A police officer ("Officer A") searched the informant to confirm that he did not already possess drugs.  *See id*.  Officer A, accompanied by another police officer ("Officer B"), transported the informant close to the place where the informant and the defendant planned to meet.  *See id.*  The informant left Officer A's police vehicle and walked for a short time when another police officer ("Officer C") observed the informant enter the defendant's car along with the defendant.  *See id.*  Officer C continuously observed the informant until he left the defendant's car two minutes later and

- 10 -

walked back toward the police vehicle where Officers A and B were waiting for him. *See id.* A fourth police officer ("Officer D") observed the defendant drive alone into the parking lot where he met the informant. *See id.* at 439. Officer D observed the informant meet the defendant and momentarily lost sight of them before he saw them enter the defendant's car together. *See id.* at 439, 442-43. The informant "had neither the time nor the opportunity to purchase the drugs while en route to the designated site and then back" to Officer A's police vehicle. *Id.* at 443. Officer A recovered two bags of cocaine from the informant when he returned to the police vehicle after meeting with the defendant. *Id.* at 438. Based on these facts, this Court concluded that "the evidence shows that [the informant] *could not have obtained the cocaine from a source other than the defendant.*" *Id.* (emphasis added). Therefore, we held in *Jones* that the circumstantial evidence established that the informant obtained the illegal drugs from the defendant. *See id.* at 444.

As in this appeal, the defendant in *Bennett v. Commonwealth*, 69 Va. App. 475 (2018), appealed his conviction for distributing illegal drugs to an informant who died before the defendant's trial. This Court found that the following evidence was sufficient to support the defendant's conviction: "[T]he informant made advance arrangements for the transaction directly with the appellant." *Id.* at 493. Before the transaction, the police investigators searched the informant and his vehicle to confirm that he had no drugs. *See id.* at 480. The investigators maintained visual surveillance of the informant until he drove into the apartment complex where the informant met with the defendant. *See id.* at 481. The investigators monitored the drug purchase with a "live" audio feed and made separate audio and video recordings of the transaction. *See id.* at 480. The video depicted the in-person drug transaction between the informant and the defendant. *See id.* at 481-82. Apart from "a fleeting view" of someone in the

first part of the video, "the only people visible in the recording are the informant and the appellant, the person he asked to sell him the drugs." *See id.* at 495.

Here, in contrast with *Jones* and *Bennett*, the circumstantial evidence fails to establish that the informant, Gale, could not have obtained the illegal drugs from someone other than the appellant, Maust. Moreover, the circumstantial evidence fails to establish that Gale obtained the illegal drugs from Maust. The purpose of the detective's initial search of Gale and his car was defeated when an unidentified person accompanied Gale while he drove to and from Maust's house. Although the detective's initial search of Gale and his car may support the trial court's finding that Gale possessed no pills before he drove to Maust's house, there is no evidence that the police searched Gale's unidentified companion. Therefore, there is no evidentiary basis for excluding Gale's companion as the source of the pills recovered from Gale.

In further contrast with *Jones* and *Bennett*, the evidence here also fails to show that the informant could not have obtained the pills from a source other than the defendant at the place where the alleged drug transaction occurred. The audio recording shows that while Gale was in Maust's house, at least two persons other than Maust were also there. In addition to the female voice that Maust identified as her tenant, Ms. Stone, a male voice was recorded exchanging greetings with Gale. The audio recording also indicates that Gale was away from Maust for approximately two minutes while he was there. The evidence does not show that Gale could not have covertly accessed some of the narcotic pills prescribed to Maust or Ms. Stone. Nor is there any evidence regarding the whereabouts of Gale's companion while Gale was inside Maust's house. Taking all of this evidence in the light most favorable to the Commonwealth, the evidence does not point unerringly to Maust as the source of the pills recovered from Gale.

The instant case is further distinguished from *Jones* and *Bennett* because the evidence here failed to establish that Maust met with Gale on the alleged date of offense for the purpose of

distributing drugs to him. *See Jones*, 21 Va. App. at 444 (A meeting between the defendant and the police informant was arranged "for the purpose of purchasing drugs."); *see also Bennett*, 69 Va. App. at 493 ("[T]he informant made advance arrangements for the [drug purchase] transaction directly with the appellant."). Here, the informant made no advance arrangements with Maust to purchase drugs from her. The Commonwealth's evidence failed to exclude the reasonable hypothesis of innocence that Maust met with Gale for the purpose of showing him various appliances and other items that she was selling in anticipation of her move to a smaller home.[7] Throughout Maust's and Gale's recorded conversation, they discussed the appliances that Maust was selling on a "first-come, first served" basis.

The Commonwealth's evidence also failed to prove that the financial transaction between Maust and Gale involved the distribution of drugs. Maust stated in the audio recording that Gale "owed" her "two fifty-four" and gave her "two seventy." Gale confirmed that he owed Maust $254 and had given her $270 when he replied that Maust owed him $16 in change. The evidence does not establish that the money was used to purchase drugs rather than to repay Maust for a personal loan or to make a legal purchase from Maust's "moving sale."[8] The Commonwealth's evidence failed to exclude these reasonable hypotheses of innocence.[9] Moreover, the recorded

---

[7] The hypothesis of innocence that Maust met with Gale to show him appliances that she was selling flows from the audio recording that Gale covertly recorded.

[8] These hypotheses of innocence flow from the audio recording—the Commonwealth's own evidence. Recognizing these hypotheses of innocence as reasonable does not require any credibility determinations in Maust's favor.

[9] The Commonwealth's evidence also failed to exclude Maust's innocent explanation for the document that the detective interpreted as an "owe sheet." Because the evidence demonstrably supports Maust's innocent explanation that the notations record a count of dollar bills by denomination, the trial court erred by arbitrarily rejecting Maust's innocent explanation and adopting the detective's incriminating interpretation. *See Wright*, 292 Va. at 397 ("[W]here a fact is equally susceptible of two interpretations one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates [the accused]." (alterations in original) (quoting *Smith*, 259 Va. at 782)).

transaction is not consistent with Gale's supposed plan to pay $300 for three pills.[10]  Therefore, the trial court's finding that the audio recording established "an exchange of money and drugs" is without sufficient evidence to support it.[11]

Because the chain of necessary circumstances to prove the alleged act of drug distribution to Gale was repeatedly broken when Gale had opportunities to obtain pills from sources other than Maust, the *corpus delicti* and the criminal agency of the accused have not been proved to the exclusion of any other rational hypothesis and to a moral certainty.  *See Wright*, 292 Va. at 397.  Therefore, the Commonwealth's circumstantial evidence is insufficient to support Maust's conviction.

### III. CONCLUSION

The Commonwealth's wholly circumstantial evidence is insufficient to exclude the reasonable hypothesis of innocence that the police informant obtained the oxymorphone pills from a source other than Maust.[12]  Therefore, the evidence failed to prove beyond a reasonable doubt that Maust unlawfully distributed a Schedule II controlled substance on October 1, 2018,

---

[10] The detective expected Gale to buy three oxymorphone pills at $100 per pill and to repay Maust $20.  According to the audio recording, Gale gave Maust $270 and received $16 in change.  After paying Maust $254, Gale should have returned $66 to the detective, but returned only $16.

[11] Maust was not on trial for being a drug dealer, but for distributing to Gale the oxymorphone pills recovered from him on October 1, 2018.  The dissent includes much discussion of evidence that Maust distributed drugs to Gale or other persons on prior occasions.  However, neither the Virginia Supreme Court nor this Court has ever held that proof that a defendant is a drug dealer justifies the inference that the defendant sold drugs to a particular individual on a specific date as charged.

[12] The dissent contends that the Commonwealth is not required to negate the possibility that the informant obtained the illegal drugs from someone other than Maust.  However, when the Commonwealth relies on wholly circumstantial evidence to prove an act of drug distribution, the Commonwealth's means of proof is by process of elimination.  A rational fact-finder cannot infer that Gale obtained the illegal drugs from Maust unless the evidence establishes that Gale had no opportunity to obtain the illegal drugs from another source.  *See Jones*, 21 Va. App. at 443.

in violation of Code § 18.2-248.  Accordingly, the Court hereby reverses the trial court's

judgment, vacates the conviction and sentencing orders, and dismisses the indictment.

*Reversed and final judgment.*

Malveaux, J., dissenting.

The majority holds that the evidence was insufficient to convict appellant for distribution of a Schedule I or II controlled substance based on the totality of the circumstantial evidence presented at trial. I respectfully disagree. Given the deference we owe the trial court as fact finder and the fact that the evidence, properly viewed, was sufficient to support appellant's conviction, I respectfully dissent.

"In accordance with established principles of appellate review for a sufficiency of the evidence case, we view the 'evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court.'" *Peters v. Commonwealth*, 72 Va. App. 378, 383 (2020) (quoting *Riner v. Commonwealth*, 268 Va. 296, 330 (2004)). Therefore, we will "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction,

- 16 -

'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"Where a controlled purchase of drugs is concerned, 'without [the informant's] testimony, the evidence proving that the [drugs] came from the defendant" may be "purely circumstantial.'" *Bennett v. Commonwealth*, 69 Va. App. 475, 492 (2018) (alterations in original) (quoting *Jones v. Commonwealth*, 21 Va. App. 435, 441-42 (1995) (*en banc*)). However, "[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence, provided that [it] is sufficiently convincing." *Pijor*, 294 Va. at 512 (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Id.* at 512-13 (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). Our review "does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence,without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).

Applying these standards, I conclude that a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support a conviction for distribution of a Schedule I or II controlled substance. In the instant case, the Commonwealth's evidence, viewed in the light most favorable to it, demonstrated that Gale went to appellant's residence with the buy money Detective Monaghan provided and the intention of buying oxymorphone pills from appellant. After arriving, Gale gave the money to appellant and returned ten minutes later with three orange oxymorphone pills. Although Monaghan did not witness the transaction, the recording demonstrated that Gale interacted with appellant, and she verbally confirmed that he

- 17 -

gave her money. Moreover, Monaghan followed Gale to and from appellant's house and searched him before and after the transaction.

Appellant admitted to having a prescription for oxymorphone, and she described the pills as orange in color to police.

During a search of Maust's house, police found "numerous pills," "pill crushers," a "pill press," "numerous prescription bottles for different narcotics, the majority of which were empty," and a "large amount" of currency. Police found $4,351 in a safe in appellant's bedroom, including $270 of the buy money given to Gale. *See White v. Commonwealth*, 24 Va. App. 446, 453 (1997) ("Considered with other factors, possession of currency by a defendant may be considered in determining whether he or she possessed drugs with an intent to distribute.").

In addition, it is well-established that "[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (second alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). Moreover, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011) (quoting *Corvin v. Commonwealth*, 13 Va. App. 296, 299 (1991)).

At trial, appellant testified that Gale repaid a debt he owed her and made a down payment on certain tools. She also testified that she had been receiving rent from as many as eight people living with her, "between three hundred and six hundred" dollars, including from her "own children." That testimony, however, was contradicted by appellant's statements to Monaghan

the day after the controlled buy, when she made no mention of rental income or of Gale making a down payment on tools and claimed the rest of the money found in the safe was money she had withdrawn from her bank in preparation for finding a new place to live.  Appellant also told Monaghan that only four people lived in the house—herself, her two sons, and a woman named Sue.

Moreover, although appellant repeatedly denied that she sold any contraband, she implied the opposite by stating that Gale "comes to me when he wants them" and that he "sells more than I do."  The evidence also established that an individual named Greg Murphy was sending appellant text messages about "getting pills."  Further, when Monaghan told appellant that two of her pills were found on Sue, appellant first claimed that she only gave the pills to Sue so that Sue could give them back later when appellant needed them.  She then admitted that she gave pills to Sue for Sue's own use but claimed that she did so only because Sue had a prescription for the same pills.

The record thoroughly demonstrates that appellant provided vague, inconsistent, and contradictory explanations for the presence of the cash in her safe and whether she distributed pills to others.  "[A] fact-finder, having rejected a defendant's attempted explanation as untrue, may draw the reasonable inference that [her] explanation was made falsely in an effort to conceal [her] guilt."  *Covil v. Commonwealth*, 268 Va. 692, 696 (2004).  I would accept the trial court's credibility determination, as it was neither plainly wrong nor without evidentiary support.

Finally, the potential presence of an unidentified person in the car with Gale[13] and of other women at appellant's house do not undermine the Commonwealth's evidence.  The majority contends that, due to the presence of these other individuals, the circumstantial evidence

---

[13] At trial, Monaghan did not recall Gale's girlfriend, Tiffany Love, accompanying Gale, but an unidentified person can be heard conversing with Gale during the drive to and from appellant's house.

- 19 -

fails to establish that Gale could not have obtained the oxymorphone pills from someone other than Maust.

The majority correctly notes that to sustain a conviction for drug distribution, where the Commonwealth relies on circumstantial evidence, "[t]here must be an unbroken chain of circumstances 'proving the guilt of the accused to the exclusion of any other rational hypothesis and to a moral certainty.'" *Jones*, 21 Va. App. at 442 (quoting *Gordon v. Commonwealth*, 212 Va. 298, 300 (1971)). "However, 'the theory of innocence must flow from the evidence, and not from the ruminations of defense counsel.'" *Id.* (quoting *Mullis v. Commonwealth*, 3 Va. App. 564, 574 (1987)). The Commonwealth is not required to "negate what 'could have been' or what was a 'possibility.'" *Nelson v. Commonwealth*, 281 Va. 212, 218 (2011). "Whether [a] hypothesis of innocence is reasonable is itself a 'question of fact' subject to deferential appellate review." *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "When examining an alternate hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *White v. Commonwealth*, 68 Va. App. 241, 252 (2017) (quoting *Vasquez*, 291 Va. at 250). "In practical terms, this means that—even if not '*inherently incredible*'—a defendant's exculpatory version of events need not be accepted by the factfinder." *Tizon v. Commonwealth*, 60 Va. App. 1, 12-13 (2012) (quoting *Montgomery v. Commonwealth*, 221 Va. 188, 190 (1980)).

Here, the trial court rejected appellant's theory that Gale received the pills from someone other than appellant, and instead found the evidence sufficient despite its circumstantial nature. Thus, the question on appeal is whether a rational fact finder, in light of all the evidence, could have rejected appellant's theories of innocence and found her guilty beyond a reasonable doubt.

*See Moseley*, 293 Va. at 464. I find that the evidence supports the finding that a reasonable fact finder could have rejected appellant's hypothesis of innocence and instead found that the evidence demonstrated an unbroken chain of circumstances proving appellant's guilt. Monaghan testified that he searched Gale and his vehicle prior to the controlled purchase, and Gale and his vehicle were free of contraband and other currency besides the buy money. Monaghan then followed Gale to Maust's residence without any unscheduled stops, observed Gale drive onto the driveway of Maust's residence, and, after approximately ten minutes, followed Gale back to the staging area without any unscheduled stops. On the recording, appellant verbally confirmed that Gale gave her money. It was, therefore, reasonable for the court to infer that the exchange of money was Gale purchasing the three oxymorphone pills from Maust. That inference is strengthened by the fact that Monaghan recovered none of the buy money—but did recover the three pills—from Gale following the transaction, and further strengthened both by what police found in appellant's residence and by her inconsistent statements.

Appellant does not point to any evidence that the unidentified woman in the car or another woman supplied Gale with the pills. Indeed, the evidence demonstrated that Gale spoke only to appellant while at her house.[14] Further, there was nothing in the conversation between the woman in the car and Gale suggesting that the woman provided Gale with any illicit contraband on the drive to or from appellant's home. The Commonwealth is not required to "negate what 'could have been' or what was a 'possibility.'" *Nelson*, 281 Va. at 218. The trial court concluded that the only reasonable inference from the circumstances before it was that Gale and appellant exchanged the buy money and the pills, and thus necessarily found that appellant's hypothesis of innocence was unreasonable.

---

[14] At one point on the recording, it appears that Gale says "hey" to another woman, but he did not have any additional conversation with her.

Based on our standards of review as an appellate court, which include both viewing the evidence in the light most favorable to the Commonwealth and deferring to the trial court's determinations as to findings of fact and credibility, I would hold that the evidence was sufficient to sustain appellant's conviction for distribution of a Schedule I or II controlled substance. Therefore, I would affirm the judgment of the trial court.[15]

---

[15] The majority cites to *Jones*, 21 Va. App. 435, and *Bennett*, 69 Va. App. 475, as support for its contention that the evidence in this case was not sufficient to support appellant's conviction. However, while there may have been additional circumstances supporting the defendants' convictions for drug distribution without the testimony of the confidential informant in those cases, that does not render the circumstances in this case inherently insufficient to support appellant's conviction. Rather, all circumstantial evidence cases are decided on the specific facts unique to each case.

In addition, we cited to, and the majority heavily relies on, the language in *Jones* that "[t]here must be an unbroken chain of circumstances 'proving the guilt of the accused to the exclusion of any other rational hypothesis and to a moral certainty.'" *Jones*, 21 Va. App. at 442 (quoting *Gordon*, 212 Va. at 300). However, as noted above, this principle is not to be viewed in isolation—rather, nothing in *Jones* alters the well-established principles regarding the trial court's ability to determine whether a defendant's hypothesis of innocence is reasonable, a finding that "is itself a 'question of fact' subject to deferential appellate review." *Haskins*, 44 Va. App. at 9 (quoting *Emerson*, 43 Va. App. at 277).